**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Robert C. Cahaly, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:13-cv-00775-JMC |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Paul C. LaRosa, III, Reginald I. Lloyd, | ) | |
| South Carolina Law Enforcement Division, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Robert C. Cahaly is a Republican political consultant who has engaged and seeks to continue to engage in political speech and political campaigns in the state of South Carolina.  (ECF No. 1-2 at 8.)  Plaintiff filed the instant action on October 31, 2012, in South Carolina state court claiming pursuant to 42 U.S.C. § 1983 that provisions of South Carolina state law enforced by Defendants Paul C. LaRosa, III, Reginald I. Lloyd, and South Carolina Law Enforcement Division ("SLED") (collectively referred to as "Defendants") violated his First Amendment right of free speech.  (ECF No. 1-2.)  Plaintiff requested declaratory relief as well as an injunction to enjoin Defendants from enforcing the relevant South Carolina Code sections.  (*Id.* at 18–19.)  Plaintiff also alleged state law claims of false imprisonment and malicious prosecution.  (*Id.* at 19–21.)

Defendants filed a notice of removal on March 22, 2013.  (ECF No. 1.)   This matter is before the court on Plaintiff's Motion for Preliminary Injunction, or in the Alternative, for Partial Summary Judgment (ECF No. 14), Defendants' Motion for Summary Judgment (ECF No. 17), and Plaintiff's Motion to Expedite the Decision (ECF No. 25).   For the reasons set forth below, the court **GRANTS** Plaintiff's motion for partial summary judgment and thereby **DENIES AS**

**MOOT** Plaintiff's motion in the alternative for a preliminary injunction and Plaintiff's motion to expedite the court's decision.  The court further **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

South Carolina Code § 16-17-446 (2003) which incorporates certain components of § 16-17-445[1] (2003 & Supp. 2013) is at the heart of the analysis of Plaintiff's constitutional claims.  Therefore, the pertinent provisions are identified herein.  Section 16-17-446, entitled "Regulation of automatically dialed announcing device (ADAD)," states as follows:

(A) Adad means an automatically dialed announcing device which delivers a recorded message without assistance by a live operator for the purpose of making an unsolicited consumer telephone call as defined in Section 16-17-445(A)(3).[2]  *Adad calls include automatically announced calls of a political nature including, but not limited to, calls relating to political campaigns.*

(B) Adad calls are prohibited except:
    (1) in response to an express request of the person called;
    (2) when primarily connected with an existing debt or contract, payment or performance of which has not been completed at the time of the call;
    (3) in response to a person with whom the telephone solicitor has an existing business relationship or has had a previous business relationship.

(C) Adad calls which are not prohibited under subsection (B):
    (1) are subject to Section 16-17-445(B)(1), (2), and (3);
    (2) shall disconnect immediately when the called party hangs up;
    (3) are prohibited after seven p.m. or before eight a.m.;
    (4) may not ring at hospitals, police stations, fire departments, nursing homes, or vacation rental units.

(D) A person who violates this section, upon conviction, must be punished as provided in Section 16-17-445(F).

---

[1] Where the court refers to § 16-17-446 within this opinion and order, it also refers to those portions of § 16-17-445 that are incorporated within § 16-17-446.

[2] While this provision references § 16-17-445(A)(3), that section defines "Prize promotion."  *See* S.C. Code Ann. 16-17-445(A)(3).  Because it is § 16-17-445(A)(4) that defines "unsolicited consumer telephone call", the court presumes that the statute's referencing of § 16-17-445(A)(3) is a scrivener's error.  Accordingly, the court denies Plaintiff's request that the court declare that § 16-17-446's reference to "ADADs" only encompasses messages containing a prize promotion. (*See* ECF No. 14-1 at 29–31.)

S.C. Code Ann. § 16-17-446 (emphasis added).  Section 16-17-445 is entitled "Regulation of

unsolicited consumer telephone calls" and states, in relevant parts:

> (A) As used in this section:…
>> (4) "Unsolicited consumer telephone call" means a consumer
>>    telephone call other than a call made:
>>> (a) in response to an express request of the person called;
>>> (b) primarily in connection with an existing debt or contract,
>>>     payment, or performance of which has not been completed
>>>     at the time of the call; or
>>> (c) to a person with whom the telephone solicitor has an
>>>     existing business relationship or had a previous business
>>>     relationship….
>
> (B) A telephone solicitor who makes an unsolicited consumer telephone call
> must disclose promptly and in a clear conspicuous manner to the person
> receiving the call, the following information:
>> (1) the identity of the seller;
>> (2) that the purpose of the call is to sell goods or services;
>> (3) the nature of the goods or services;…
>
> (F) The department[3] shall investigate any complaints received concerning
> violations of this section.  If the department has reason to believe that there
> has been a violation of this section, it may request a contested case hearing
> before the Administrative Law Court to impose a civil penalty…The
> department may also bring a civil action in the Court of Common Pleas
> seeking other relief, including injunctive relief, as the court considers
> appropriate against the telephone solicitor.  *In addition, a person who violates
> provisions of this section is guilty of a misdemeanor* and, upon conviction for
> a first or second offense, must be fined not more than two hundred dollars or
> imprisoned for not more than thirty days….  Each violation constitutes a
> separate offense for purposes of the civil and criminal penalties in this
> section.

S.C. Code Ann. § 16-17-445 (emphasis added).

Collectively, §§ 16-17-446 and 16-17-445 have the impact of prohibiting consumer and

politically-related unsolicited calls made by ADADs, also referred to as "robocalls," with some

exceptions.  *See* S.C. Code Ann. §§ 16-17-446 and 16-17-445.  Excepted from § 16-17-446's

general ban on political and commercial robocalls are calls that are based on some form of

---

[3] "Department" refers to the Department of Consumer Affairs.  S.C. Code Ann. § 16-17-445(A)(6).

consent by the person called or some existing relationship between the person called and the caller. *See* S.C. Code Ann. § 16-17-446(B). Even where a political or commercial robocall meets the exception criteria, the statute requires that the caller announce certain identifying information about the source of the call and the call's purpose. S.C. Code Ann. §§ 16-17-446(C), 16-17-445(B). Where a robocaller violates the provisions of the statute, he may be punished by civil penalty, injunctive relief, or criminal misdemeanor conviction. S.C. Code Ann. §§ 16-17-446(D), 16-17-445(F).

On September 17, 2010,[4] at Plaintiff's request, a state representative sought an opinion from the state attorney general on the legality of certain political phone calls. (ECF No. 14-2 at 10.) Specifically, the state representative inquired whether under South Carolina law it was acceptable to make political calls to answering machines but not to live answers. (*Id.*) The representative also asked whether it was legal for organizations such as Survey USA to conduct automated survey calls that require a recipient's response via phone key. (*Id.*)

The state attorney general responded in an official opinion on September 22, 2010. (ECF No. 14-2 at 11–12; S.C. Att'y. Gen. Op. dated Sept. 22, 2010 (2010 WL 3896174).) In that opinion, the state attorney general stated his belief that it was legal for a person to make political phone calls with a recorded telephone message delivered to an answering machine and not a live person. (ECF No. 14-2 at 11–12; S.C. Att'y. Gen. Op. dated Sept. 22, 2010 (2010 WL 3896174).) The state attorney general further opined that the purpose of § 16-17-446 was to "prohibit the unwarranted invasion by automated dialing devices in order to promote the advocacy of a 'product' including a particular candidate." (ECF No. 14-2 at 11–12; S.C. Att'y.

---

[4] Although the letter is dated September 17, 2009, Plaintiff alleges it was written September 17, 2010. (*Compare* ECF No. 14-2 at 10 *to* ECF No. 14-1 at 5.) The record does not resolve this conflict; however, this fact is not material to the issues of the case.

Gen. Op. dated Sept. 22, 2010 (2010 WL 3896174).)  As such, the state attorney general concluded that organizations such as Survey USA were allowed to conduct political ADADs that require the recipient's responses via phone key.  (ECF No. 14-2 at 11–12; S.C. Att'y. Gen. Op. dated Sept. 22, 2010 (2010 WL 3896174).)  However, the state attorney general cautioned that those political ADADs could not advocate for a particular political candidate but could instead obtain a simple snapshot opinion of a voter.  (ECF No. 14-2 at 11–12; S.C. Att'y. Gen. Op. dated Sept. 22, 2010 (2010 WL 3896174).)  Thus, the state attorney general interpreted § 16-17-446 to allow political ADADS that were either delivered to an answering machine or that obtained a voter's opinion by phone key.

In late September 2010, State Representative Anne Peterson Hutto formally requested that Defendant SLED investigate robocalls made in reference to her electoral race.  (ECF No. 17-3 at 2–3.)  Representative Hutto asked that Defendant SLED investigate because her electoral opponent was an assistant solicitor and as a result, Representative Hutto felt local law enforcement would have a conflict of interest in handling the matter.  (*Id.* at 2.)  Defendant SLED's investigation revealed that political robocalls had been made in reference to the races of six female Democratic candidates for the South Carolina House of Representatives (collectively referred to as "the female Democratic candidates" or "the FDCs").  (ECF No. 17-1 at 2; ECF No. 17-2 at 2.)  In early October, Defendant SLED received voluntary statements from each of the female Democratic candidates.  (ECF No. 17-4 at 2–9.)  The FDCs complained that robocalls were made, without their authorization or consent, which the FDCs believed were intended to adversely impact their campaigns.  (*Id.*)

Defendant LaRosa asserted in a sworn affidavit that Representative Hutto, one of the female Democratic candidates, provided Defendant LaRosa an electronic recording of one of the

ADAD calls made within her district.[5]  (ECF No. 17-2 at 2.)  Defendant LaRosa averred that the

recorded robocall made to Representative Hutto's constituent stated the following:

> Please hold for a one-question survey.
>
> As you may have heard, Speaker of the House Nancy Pelosi is coming to South Carolina.
>
> Do you think incumbent Democrat Anne Peterson Hutto should invite her fellow Democrat Nancy Pelosi to come campaign for her?
>
> Press 1 if you think incumbent Democrat Anne Peterson Hutto should invite her fellow Democrat Nancy Pelosi to come and campaign with her.
>
> Press 2 if you think incumbent Democrat Anne Peterson Hutto should not invite her fellow Democrat Nancy Pelosi to come and campaign with her?

(*Id.* at 2–3.)

Defendant SLED learned through its investigation that Plaintiff was responsible for the

calls that were placed.  (ECF No. 17-1 at 3.)  Specifically, Defendant SLED determined that

Plaintiff was the president for the entity that paid the phone bills for the phone number from

which the calls were made.  (ECF No. 17-2 at 3.)  Defendant SLED presented arrest warrants for

Plaintiff to a state magistrate judge who signed the warrants on November 1, 2010.  (ECF No.

17-1 at 4.)  On November 3, 2010, Plaintiff turned himself in at a detention center where he was

booked and released on his own recognizance.  (*Id.* at 4.)  At some point, Plaintiff's criminal

matter was transferred to the Solicitor's Office for the First Judicial Circuit of South Carolina.

(ECF No. 17-2 at 4.)  On May 1, 2012, the First Circuit Solicitor's Office dismissed the warrants

against Plaintiff.  (ECF No. 17-7 at 2.)

---

[5] In a written voluntary statement that was sworn and witnessed, Representative Hutto stated that she obtained an audio recording of the robocall from one of her constituents on September 24, 2010.  (ECF No. 17-4 at 2.)

On October 31, 2012, Plaintiff filed this action in South Carolina state court stating under 42 U.S.C. § 1983 that Defendants violated the First Amendment on its face and as applied to Plaintiff.  (ECF No. 1-2; ECF No. 14-1 at 14–16.)  Plaintiff requested declaratory relief and requested that Defendants be enjoined from enforcing the state ADAD law's restrictions on political robocalls.  (ECF No. 1-2 at 18–19.)  Plaintiff further claimed that he was falsely imprisoned and maliciously prosecuted in violation of state law.  (*Id.* at 19–21.)  Defendants removed this action to federal court on March 22, 2013.  (ECF No. 1.)

On November 14, 2013, Plaintiff moved for a preliminary injunction, or in the alternative, for partial summary judgment.  (ECF No. 14.)  On December 6, 2013, Defendants responded to Plaintiff's motion, (ECF No. 18), and also moved for summary judgment (ECF No. 17).  On December 16, 2013, Plaintiff replied in support of his motion.  (ECF No. 19.)  On December 21, 2013, Plaintiff filed a response to Defendants' motion for summary judgment.  (ECF No. 20.)  On January 10, 2014, Defendants replied in support of their motion for summary judgment.  (ECF No. 23.)  On March 30, 2014, Plaintiff moved to expedite the court's decision.  (ECF No. 25.)

## LEGAL STANDARDS

### Preliminary Injunction

A preliminary injunction is an extraordinary remedy and a plaintiff seeking such remedy carries a substantial burden.  *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008).  In order for a court to grant a preliminary injunction, a movant must show (1) he will likely succeed on the merits, (2) he will suffer irreparable harm in the absence of the injunction; (3) the balance of equities weighs in his favor; and (4) such relief would be in the public interest.  *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008).  The Fourth Circuit has recognized that

"in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 190 (4th Cir. 2013). In jointly considering the third and fourth *Winter* prongs, the Fourth Circuit has established that a state is not harmed by a preliminary injunction where the enforcement of a statute would likely be found unconstitutional. *Id.* at 191. The Circuit Court has also instructed that "upholding constitutional rights surely serves the public interest."

Therefore, in the First Amendment context, the first *Winter* factor of likelihood of success substantially predominates the preliminary injunction analysis. Generally, where a movant demonstrates that he will likely be successful on his constitutional claim, courts will grant the injunction.

## Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011). In ruling on a motion for summary judgment, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue.  *See id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion.  *See Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

## DISCUSSION

### Section 1983:  First Amendment Claim

Plaintiff's motion for a preliminary injunction requests that the court enjoin Defendants from enforcing § 16-17-446 based on Plaintiff's claim that the statute violates Plaintiff's First Amendment rights.  (ECF No. 14-1 at 1.)  Plaintiff also moves in the alternative for partial summary judgment whereby the court would find the statute unconstitutional and issue a permanent injunction.  (*Id.* at 1–2.)  Quite expectedly, Defendants' motion for summary judgment focuses primarily on the contention that the state statutory provisions regulating political robocalls do not violate the First Amendment.  (*See* ECF No. 17-1 at 4–5.)  Given the predominance of this claim throughout the various motions, the court will address it first.

A.  First Amendment Claim

1.  Content-Based Restriction

A central tenet of First Amendment jurisprudence is that the government may not restrict speech on the basis of its content.  *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").  Where a statute places a differential burden on speech due to its content, it must withstand a strict scrutiny analysis by the court.  *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376 (4th Cir. 2013). "In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  *Id.* (internal quotations and citation omitted).

i.  Content-Based or Content-Neutral Distinction

The Supreme Court has stated the following with respect to the content-based or content-neutral inquiry:

> As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.  By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral.

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994).  In determining whether a restriction of speech is content-based or content-neutral, the Fourth Circuit has adopted a pragmatic approach.  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 556 (4th Cir. 2013).  "The principal inquiry in determining content neutrality in speech cases…is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Brown v. Town of Cary*, 706 F.3d 294, 301 (4th Cir. 2013).  If the government has adopted

legislation in an effort to censor a particular subject matter over others, strict scrutiny applies. *Clatterbuck*, 708 F.3d at 556.

Plaintiff contends that the code restrictions, in conjunction with the state attorney general's interpretation of the provisions, are content-based because the government must look at the content of the speaker's message to determine whether the law has been violated.  (ECF No. 14-1 at 13.)  Essentially, Plaintiff argues that § 16-17-446 is content-based because it restricts calls on the basis of whether their subject matter is commercial or political.  (*See id.* at 13.)  Defendants cite to *Brown v. Town of Cary*, to argue that the Fourth Circuit's analysis focuses on the purpose behind the regulation's adoption and not whether the government must look to the content of the speaker's message.  (ECF No. 17-1 at 6–7.)

Indeed, the Fourth Circuit has declined to adopt an analysis, as some circuit courts have, which focuses on whether the government must look to the content of the speaker's message. *See Brown v. Town of Cary*, 706 F.3d at 302 ("In our view…such an approach imputes a censorial purpose to every content distinction, and thereby applies the highest judicial scrutiny to laws that do not always imperil the preeminent First Amendment values that such scrutiny serves to safeguard.").  However, the court understands the Fourth Circuit's guidance to indicate that a law, which distinguishes on the basis of content, will be classified as content-based *unless* the state can show that the law was adopted without a censorial purpose.  *See Clatterbuck,* 708 F.3d at 556; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994) ("[T]he mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content.").  While Defendants articulate the correct standard which emphasizes the purpose behind the regulation's adoption, (ECF No. 17-1 at 6–7), Defendants

have not presented any evidence of the legislature's intent in adopting § 16-17-446's ban on political robocalls.

Plaintiff references an opinion of the state attorney general, which constitutes the state attorney general's interpretation of the statute. (*See* ECF No. 14-1 at 5.) Plaintiff does so for reasons unrelated to the court's inquiry into the legislature's intent in implementing § 16-17-446. Nonetheless, the court finds that the state attorney general's opinion could be relevant to its inquiry because "[a]lthough attorney general opinions are not precedential, they are afforded great weight in South Carolina, particularly in matters of statutory construction." *Mun. Ass'n of S.C. v. Omaha Prop. & Cas. Ins. Co.*, 2007 WL 7945179 at *6 (D.S.C. Apr. 9, 2007) (internal quotation marks and citation omitted). The state legislature is presumed to have notice of the state attorney general's opinion especially since a state representative requested the opinion. *See Napa Valley Educator's Ass'n v. Napa Valley Unified Sch. Dist.*, 194 Cal. App. 3d 243, 251 (1987) ("In the absence of controlling authority, [attorney general] opinions are persuasive since the legislature is presumed to be cognizant of that construction of the statute.") (internal quotation marks and citation omitted); *see also Browning-Ferris, Inc. v. Virginia*, 300 S.E.2d 603, 605–06 (Va. 1983) ("The legislature is presumed to have had knowledge of the Attorney General's interpretation of the statutes, and its failure to make corrective amendments evinces legislative acquiescence in the Attorney General's view.").

The state attorney general interprets § 16-17-446 to allow political robocalls so long as they are either delivered to an answering machine or they conduct a survey, which requires a response via phone key and which does not promote a particular candidate. (ECF No. 14-2 at 11–12; S.C. Att'y. Gen. Op. dated Sept. 22, 2010 (2010 WL 3896174).) The state attorney general stated that the legislative purpose of § 16-17-446 was to prevent the use of robocalls,

which promoted a particular candidate.  (*Id.*)  However, from this meager explanation, the court cannot determine the full intent of the legislature in banning political robocalls, the central question for resolving whether the restriction is content-based.  *See Clatterbuck*, 708 F.3d at 555 ("In this inquiry, the government's purpose is the controlling consideration.") (internal quotation marks and citation omitted).

Having no evidence from either party regarding the legislative intent, the court has conducted its own inquiry into the legislative history of § 16-17-446's prohibition on political robocalls.  The court was unable to locate any indication of the legislature's purpose for the restriction.  In the absence of any evidence regarding this issue, the court believes it is constrained to find upon the parties' cross-motions for summary judgment that Plaintiff has met his burden in demonstrating that § 16-17-446 restricts speech on the basis of content.

The court further concludes that Defendants have failed to negate the content-based classification due to their inability to demonstrate that the state enacted the legislation for a non-censorial purpose.  The court finds it appropriate to place the burden on the state to establish a content-neutral legislative intent because the state entity is the party best positioned to obtain such evidence.  Moreover, the court is concerned that placing such burden on the party challenging the statute would create a disincentive for the legislature to create and preserve its legislative history.  In that alternative universe, any content-based statute would be upheld where no evidence of legislative intent could be found.  Because the court views such a result contrary to the law's general disfavor of content-based regulations, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), the court construes the Fourth Circuit's guidance to require the state to factually support its claim of a non-censorial purpose.  *See also Clatterbuck*, 708 F.3d at 559 ("Indeed, in the cases…proffered by the City to support content-neutrality, the government's justification for

the regulation was established in the record, and the court was able to weigh evidence supporting that justification.").

    ii.  Strict Scrutiny

Having concluded that § 16-17-446 is a content-based restriction, the court evaluates the statute under strict scrutiny.  To survive strict scrutiny, a statute (1) must promote a compelling governmental interest and (2) must be narrowly tailored to support that interest.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000).  Where "a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  *Id.*  Defendants state that the government's purpose in banning political robocalls is to protect residential privacy.  (ECF No. 17-1 at 11.)  Robocalls, Defendants contend, are very intrusive and do not allow listeners to interact with the callers to prevent future calls.  (*Id.* at 11–12.)  The court is certainly sympathetic to that concern and notes that several courts have upheld the constitutionality of robocall restrictive statutes under the intermediate scrutiny framework.  *See, e.g., Maryland v. Universal Elections*, 729 F.3d at 376–77 ("[T]he Supreme Court has long recognized that preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value.") (internal quotation marks and citation omitted); *Van Bergen v. Minnesota*, 59 F.3d 1541, 1555 (8th Cir. 1995).

Nevertheless, and quite significantly, Defendants state "[t]he government's interest is in eliminating virtually all robocalls, not just those that express particular points of view, or only those that express commercial messages, or only those that express political messages."  (ECF No. 23 at 4.)  Given that interest, the court finds the statute is fatal for its underinclusiveness and its singling out of commercial and political speech.  "A law is underinclusive…and thus not

narrowly tailored, when it discriminates against some speakers but not others without a legitimate 'neutral justification' for doing so." *Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 345 (4th Cir. 2005).

Defendants argue that § 16-17-446 is not unlawfully underinclusive because it does not fit the criteria identified by the Fourth Circuit in *National Federation of the Blind* of what constitutes an impermissible underinclusive restriction.  (ECF No. 23 at 4–5.)  Those categories are (1) "where the law represents an attempt by the government to give one side of a public debate an advantage over another; (2) where the regulation is so broad or narrow in scope that it undermines the likelihood of a genuine governmental interest; and (3) where the underinclusiveness is so severe that it raises serious doubts about whether the government is actually serving the interests it invokes."  *Nat'l Fed'n of the Blind*, 420 F.3d at 346.  On this record, the court cannot conclude that the restrictions at issue in this case do not fall within any of the categories.  Without any evidence regarding the legislature's purpose for restricting robocalls on the basis of their commercial or political content, the court finds the statute's differential treatment of speech impermissible.[6]

Accordingly, § 16-17-446's content-based restriction does not withstand strict scrutiny and therefore violates the First Amendment.  For that reason, the court grants Plaintiff's motion

---

[6] The court notes that while several courts have upheld restrictions on robocalls, those cases involved statutes that prohibited all types of robocalls with allowances for some exceptions.  *See Van Bergen v. Minnesota*, 59 F.3d 1541 (8th Cir. 1995) (upholding a Minnesota robocall statute which applied to all callers regardless of the content of their messages); *Bland v. Fessler*, 88 F.3d 729 (9th Cir. 1996) (upholding a California utilities statute regulating ADADs which applied broadly to all users of ADADs); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370 (4th Cir. 2013) (finding the identification requirement provisions of the Telephone Consumer Protection Act ("TCPA") constitutional in part because the disclosure requirement applied regardless of the content of the message).  In contrast, the statute at issue in the instant case singles out political and commercial robocalls as the only type of calls that are generally prohibited.

for partial summary judgment.[7]  The court proceeds to briefly address Plaintiff's remaining First Amendment arguments.

####    2.  Compulsory Speech

Plaintiff argues that the requirements for ADAD calls that are excepted under the statute (calls that are based on consent or a previous relationship) generate compulsory speech.  (ECF No. 14-1 at 16–19.)  Section 16-17-446 requires that the caller who falls into the exception identify the originating party, the purpose of the call, and the nature of the call.  *See* S.C. Code § 16-17-446(C)(1).  Plaintiff argues the disclosure requirements are political in nature and violates his constitutional right not to speak.  (ECF No. 14-1 at 18.)

The First Amendment protects the right to both speak freely and to refrain from speaking at all.  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  However, in *Maryland v. Universal Elections, Inc.*, the Fourth Circuit upheld under intermediate scrutiny the Telephone Consumer Protection Act's ("TCPA") requirements that an ADAD identify the entity sponsoring the call and the entity's phone number because it was a content-neutral provision that furthered important governmental interests.  *Maryland v. Universal Elections*, 729 F.3d at 376–77.  The Fourth Circuit ruling was predicated largely on the fact that the disclosure applied to all ADADs regardless of content.  *Id.* at 376.  Similarly, if the disclosure provision in the instant case were applied without regard to content, the court could apply a similar analysis as that which was applied in *Maryland v. Universal Elections* and find the provision constitutional.  However, in the instant case, the court finds § 16-17-446's requirements impermissible because they are triggered on the basis of the speech's content.  For that limited reason, the court finds § 16-17-446 an impermissible compulsion of speech.

---

[7] Plaintiff's motion, in the alternative, for a preliminary injunction is thereby rendered moot.

3.  Vagueness

Lastly, Plaintiff contends that several phrases within § 16-17-446 are unconstitutionally vague such that they do not provide sufficient notice of the conduct prohibited and encourage arbitrary enforcement.  (ECF No. 14-1 at 19–24.)  The phrases at issue are (1) "calls of a political nature"; (2) "including, but not limited to, calls relating to political campaigns"; (3) "in response to a person with whom the telephone solicitor has an existing business relationship or has had a previous business relationship"; (4) "the identity of the originating party"; (5) "the endorsement of a candidate"; and (6) "nature of the call".  (*Id.*)  Defendant responds that Plaintiff lacks standing to challenge the statute on the basis of vagueness because his conduct falls squarely within the core of the statute's restrictions.  (ECF No. 17-1 at 14–15.)

A statute is vague where it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement."  *Brown v. Town of Cary*, 706 F.3d at 305–06.  The vagueness doctrine does not require the legislature to define terms with "mathematical certainty" but instead commands that the statute provide sufficient guidance for an ordinary citizen to know what it means.  *Id.* at 306.

While at first glance the court is not troubled that a person of ordinary intelligence would understand § 16-17-446, a substantive vagueness analysis is not warranted given the issue of standing raised by Defendants.  "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Parker v. Levy*, 417 U.S. 733, 756 (1974).  In this case, Plaintiff's calls regarding the political campaigns of the FDCs were clearly of a political nature and related to a political campaign.  Plaintiff has not identified any previous relationship he had with those who were called, so the court presumes that no such relationship existed.  The entity

originating the call was presumably Plaintiff or some organization of the Republican Party.  The call did not endorse a political candidate, but instead, the nature of the call was to conduct a political question survey.  Because the provisions of the statute are clear as applied to Plaintiff's conduct, the court finds Plaintiff has no standing to challenge § 16-17-446's constitutionality on vagueness grounds.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) ("[A]ny such uncertainty has little relevance here, where [the challenger's] conduct falls squarely within the 'hard core' of the statute's proscriptions[.]").

B.  Qualified Immunity

While at this posture, Plaintiff solely seeks declaratory and injunctive relief regarding the constitutionality of the state robocall restrictions, Defendants address in their motion for summary judgment the full merits of Plaintiff's § 1983 action.  Thus, in addition to the requests for declaratory and injunctive relief, Defendants also respond to any request for damages Plaintiff may be seeking as a result of the alleged constitutional violation.  (*See* ECF No. 17-1 at 16–20; *see also* ECF No. 1-2 at 18.)  Defendants LaRosa and Lloyd contend that they are entitled to qualified immunity from damages.  (ECF No. 17-1 at 16–20.)

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The steps in determining whether officials are entitled to qualified immunity are:  (1) an inquiry into whether the plaintiff has alleged a deprivation of a constitutional right and (2) whether that right was clearly established at the time of the alleged violation.  *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001).  Under the facts as established for the purposes of summary judgment, Plaintiff has alleged a deprivation of a

constitutional right.  However, that right was not clearly established because no other state or federal court opinion had at the time of Plaintiff's arrest addressed the constitutionality of § 16-17-446.  Moreover, Defendants' arrest of Plaintiff was arguably consistent with the state attorney general's interpretation of the statute (which did not address any constitutional question) because Plaintiff did not comply with the disclosure requirements of the statute.

For these reasons, Defendants LaRosa and Lloyd are entitled to qualified immunity for any damages alleged by Plaintiff with regard to Plaintiff's First Amendment claim under § 1983.

## State Law Claims:  False Imprisonment and Malicious Prosecution

In their motion for summary judgment, Defendants argue that Plaintiff's state law claims of false imprisonment and malicious prosecution are without merit because Defendants had probable cause for Plaintiff's arrest.  (ECF No. 17-1 at 20–23.)  To establish the claim of false imprisonment, Plaintiff must show that Defendants intentionally restrained Plaintiff *unlawfully*. *Law v. S.C. Dep't of Corr.*, 629 S.E.2d 642, 651 (S.C. 2006).  To establish the claim of malicious prosecution, Plaintiff must establish that Defendants instituted judicial proceedings against him with malice and *without probable cause*.  *Id.* at 648.  Moreover, Plaintiff must show that the proceedings were terminated in his favor and that they resulted in injury or damage.  *Id.*

The court agrees with Defendants' contention that the existence of probable cause bars Plaintiff's state law claims.  Plaintiff argues at length that Defendants did not possess probable cause to arrest him.  (*See* ECF No. 20 at 44–49.)  However, the court finds the issue of probable cause straightforward.  Probable cause is defined as "a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise."  *Jones v. City of Columbia*, 389 S.E.2d 662, 663 (S.C. 1990).

Defendants have demonstrated that the FDCs requested an investigation, which was appropriately conducted regarding political robocalls made within the FDCs' districts. Defendants' investigation revealed that Plaintiff either violated § 16-17-446's blanketed prohibition on political robocalls or that, even within an exception to the statute or within the state attorney general's guidance, Plaintiff failed to make the necessary identifying disclosures. For any of those reasons, Defendants possessed probable cause to arrest Plaintiff. Therefore, the court finds that Plaintiff's state law claims fail as a matter of law and that Defendants are entitled to summary judgment for these claims.

**CONCLUSION**

For the foregoing reasons, the court **GRANTS** Plaintiff's motion for partial summary judgment (ECF No. 14), declaring S.C. Code § 16-17-446's restrictions on political robocalls unconstitutional and issuing a permanent injunction against its enforcement in that regard.[8] The court therefore **DENIES AS MOOT** Plaintiff's motion, in the alternative, for a preliminary injunction (*Id.*) and Plaintiff's motion to expedite the court's decision (ECF No. 25). The court **GRANTS IN PART** Defendants' motion for summary judgment with respect to Plaintiff's state law causes of action as well as Plaintiff's individual damage claims under § 1983 against Defendants LaRosa and Lloyd. (ECF No. 17). The court **DENIES IN PART** Defendants' motion for summary judgment regarding Plaintiff's First Amendment claim for declaratory and injunctive relief. (*Id.*)

---

[8] The court's ruling applies to § 16-17-446's prohibition of political robocalls as such was the only issue before the court. The court has not addressed the statute's constitutionality as it relates to the ban of commercial robocalls, and the court recognizes that the commercial speech analysis would involve distinct considerations. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980) ("The Constitution therefore accords lesser protection to commercial speech than to other constitutionally guaranteed expression.").

**IT IS SO ORDERED.**

_J. Michelle Childs_

United States District Court Judge

June 10, 2014
Columbia, South Carolina